Okay, thank you. Yes, we're here on our appeal of the decision of Judge Kobayashi whereby she had granted some adjustment to the defendant in our case involving disability discrimination and Whistleblower Protection Act claims. You know, our position, the judge had indicated in her decision that she found that my client was not qualified for her position. We have indicated that the evidence would have shown, if allowed to do the return, that she was qualified for her position despite the fact that she had asked for an accommodation to some extent regarding her driving to the various sites where she had to do the material fact as to whether there was a legitimate non-discriminatory reason for termination and our position is that there were issues related to whether or not there was a pretext for the termination. Counsel, can I ask about the qualified factor? How was your client qualified for the job? If you walk through, when you walk through the reports, the performance reports and the complaints that were received from clients, it's pretty glaring that she seemed not to really be able to perform her job. Does that affect whether she was a qualified individual for her job or do we have to take the fact that because they let her stay on, that by definition meant that she was qualified for her job? Well, I mean, she started working in 2010. We had some initial performance reviews which were negative. Her last given raises. Yes, there were some issues pointed out to her. Well, I mean, just to be clear, I understand you want to put a good light on it, but I mean, it wasn't just some initial reviews that were bad. Every single review was bad and I mean, yes, she was given a raise, but she had a negative review and I guess that's part of the question. Are we supposed to look at an individual and say because they remained employed, they were a qualified employee or do we look at it and say because they had the right to terminate her for failing to perform her job function satisfactorily. Therefore, she was not a qualified employee. Well, I mean, like I said earlier, yes, she had some negative reviews, but she did improve. They kept her on. They gave her raises. They mentioned in that email in May 2015 that she was a very valuable employee. I mean, that's evidence that obviously, yes, she has some deficiencies here and there. You put the searchlight on things, but the fact of the matter is she was qualified. They kept her on. They gave her raises. They said she was a very good employee, very valuable employee. On the qualification issue, are you challenging the district court's refusal to consider what she called the take a break accommodation as not having been completed or raised prior to summary judgment? Are you challenging that rule? Yes, I am because the judge ignored the fact. I'm not sure I saw that in your brief. Where is that? The discussion of the qualification issue on 29 to 30 talks about three minutes driving, but I didn't see it raising that issue. Well, the issue was raised on oral argument and the judge ignored the fact that, in fact, the restriction was 40 minutes of continuous driving, whereas the judge said that the fact was that the she had to do the inspection, and therefore the judge found that she couldn't get to all the places she needed to get to, which was not accurate, because the record shows that my client indicated at some point that if you can't give me the accommodation of giving me places that are closer to my house in Kailua, that's okay because I can just drive for 40 minutes and take a break. Well, let me focus further on that, because I look at the concise statement of facts, which was submitted by defendants, and number 44 talks about that, and it says Bach's home and CTA were in Kaneohe in early 2016. Only 2% of providers were where CTA could reasonably guarantee Bach would not drive more than 40 minutes consecutively for on-site reviews. Assigning Bach only to such providers would have been less than a week of full-time work per month, and your response didn't dispute that. So why can't the district court simply say, well, that's a given. I can move on from here, and if you can only do 2% of the providers, you're not qualified. Because that wasn't what the restriction was. The restriction was 40 minutes of... Well, you didn't dispute the conclusion. Their conclusion was that, as they understood it, she could have done less than a week of full-time work per month. Yes. And you said that's not true because she could stop, but your concise counterstatement doesn't say anything about that, and indeed, as Judge Collins raised, it's not really clear to me that that's the argument that was offered up to the district court. Well, they were premising their argument and their position on that, the fact that it was a restriction of 40 minutes continuous driving, and that the place had to be within that range. But the restriction was 40 minutes of continuous driving, and then she could take a break after that. Is there anything in the break would have to be? I don't believe there's any discussion about that. So, I'm not sure how the employer is supposed to take that. If it's a two-minute break or a five-minute break, that's one thing. If it's a half-hour break, that's quite another. It's not like we have lots of rest stops on the highway here. You can pull over and walk around, and none of this seems to be offered up to the district court. Well, as indicated, when I did argue with the judge, I noted that the restriction was not that she could only drive for 40 minutes. It was she could drive for 40 minutes continuously, and then the record shows that there was an indication that that would not be a problem, because she could simply take a break. But was that fleshed out? If there's nothing in the record about what a break constitutes, I'm not sure what we're supposed to make of that. Well, that's why the case should have been allowed to go to the jury. Well, it doesn't go to the jury just because you haven't put in a record. If you don't put in a record to say that taking a break is practical, I don't know why the court should take that as a given. If you haven't contested the concise statement of fact that raises that issue, why should the court do that work for you? Well, when I got to oral argument, I realized that that was the position, and that was exactly what the doctor's note said. And it's in the record because she indicated, and even in their memos, and on the appeal memos, they recognize the fact that she said it or she could just take a break. What did she say in her deposition? What did your client say in her deposition? Because I thought she said, there's some suggestion by the district court that your client conceded she could only service 2% of the client. But when I went and read the deposition, that didn't match up. And so I'm wondering where, you know, it seemed like that your client had said, yes, I can only drive for 40 minutes, but she did not concede that that would only restrict her to 2%, to accessing 2% of the client. Absolutely, and the record shows that later on in February, when they were having the discussion about the restriction, that it was clarified that there were only two places she couldn't go to, and that she could go to all the other places. So it wasn't limited to 2%. Because they were saying, oh, it's different, so it's different if your client doesn't concede that. But where did your client, you know, make this argument that there was a way for her to access all of the others? I can only drive, yes, it's true, I can only drive 40 minutes. But where did she say that is not going to prohibit me from servicing more than just 2% of the client? Well, my recollection is that one of the concise statements of facts of the deposition... In yours, but I think that's what Judge Clifton was just referencing. And it would be helpful if you could point us to a place where, I mean, even if there were record evidence that was before the district court, where your client actually said, either in her deposition testimony, or you pointed it out through something else, that this would not limit her. Because as it stands, it seems like the defendants instead, this would limit her to 2%, covering 2% of the potential clients. And while your client may not have conceded that point, I don't know where she's disputed that point either. Well, again, I'd have to look at their concise statement of facts. But I recall when I was preparing for oral argument, that there was a fact stated where my client did say that it would not be a problem because she could just take a break. Because initially she wanted to work closer to home. That wasn't going to be doable because there's only 2% of the homes within the radius of 40 minutes to Kailua. And then she said, okay, well, it's 40 minutes consecutive driving, what the doctor said, so I can just take a break. So I can do all these other questions. But your position is that you believe she said that in her deposition? Well, I believe it's, that's one of the... Well, she either said it in her deposition or she submitted an application. Well, I believe it's in their concise statement of facts, which is that they made that as a fact, that she said it wouldn't be a problem. I mean, if I'm reviewing their concise statement of facts, I don't have a problem with that. Yeah, that's her position. And they put that in their concise statement of facts. She said it wasn't a problem. Do you want to reserve any time for rebuttal? Yes, why don't I reserve two minutes? So I'll, unless you have another follow-up question. Yeah, if either of the panel, anybody have any further questions? No, we'll let you reserve. Thank you. Okay. Mr. Ernst? May it please the court, Joe Ernst for Community Ties of America. So first, I'd like to kind of address this take a break accommodation or potential accommodation request. I think that it's worth noting to the court that this theory of the king was never raised prior to Joaquin's argument in the Supreme Court's judgment. Can you move closer, move the microphone closer to you? I really can't hear what you're saying. Sorry, Your Honor, can you hear me a little bit better now? That's great. I'd like to address this take a break accommodation that was raised for the first time during the motion for summary judgment while we were before the district court. And I wanted to note that this take a break accommodation was not found anywhere prior to actually being in that motion for summary judgment. It is, it is in your concise statement of facts. Just fact 45 says England said CTA could not guarantee a limit of 40 minutes consecutive driving, particularly given traffic. Bach responded it was not an issue. She could leave the highway if necessary. Right. The way we viewed that though is that first, that that wasn't actually a request for a reasonable accommodation. That was disclaiming the need of her prior accommodation. That it was and that's fine. I think that we can assume that it was for the purposes of this. We granted that accommodation for her. There's nothing in the record that shows that we denied that accommodation. Said I need to, it doesn't matter, I don't need 40 minutes consecutively. I can pull off to the side of the road. And we said okay. That I can't drive to Wahiawa to two of the providers. And we said okay, we reassign those. Ultimately there's a little bit of confusion about what the termination consisted of. If you look at the concise statement of facts, the termination was really premised on all of these performance deficiencies. And failing to meet the performance improvement plan which Bach herself admits to her. So can I, can I ask a question about that? I think it is clear that there was pretty widespread performance deficiency here. But how do we as a court analyze that in this particular case? Because it seems like you have not argued that those performance deficiencies made her not qualified, not a qualified individual for the job. Is that, is that correct? You've sort of waived that argument or conceded it? Yeah, you know, I think that when you look at everything that that is likely correct. What we did or what the court looked at that, the district court looked at that for, in essence, what we did is we moved from that step whether we could articulate a legitimate non-discriminatory reason. So your position is even if, even if the court found a prima facie showing of pretext, your client is still entitled to judgment. The district court is entitled to be affirmed, should be affirmed because the poor performance, there was enough showing that that rebuts the pretext. Yes. We're losing, we're losing you again, counsel. For us, when we examine this case, you know, we think that the crux of the case is temporal proximity. So, you know, all of the concise statement of treatment plans, the fact that she did not actually ever move, that there were numerous complaints from providers that resulted in a loss of licensure, that you guys actually investigated those complaints, whether they were valid or not, but then actually reacted based on those complaints. So what is Fox's argument? What, what saved the case? The only thing that we can say is that Mr. Brower attempts to say that temporal proximity is enough, and that's true whether it's retaliation or the Federal Fly-With-The-Cross-Text Act, or even disability between youths. I mean, when we look at temporal proximity, youth law is pretty clear. Nine months alone is not enough. I mean, but the nine months was, you know, they initially told her if you don't come back, and you're going to be terminated, you won't have a job. And then, you know, they let her stay away for a while. And then she comes back with a performance plan that's kind of a glide path towards a termination. So it kind of looks like just a slow roll plan towards termination, at least on summary judgment, drawing inferences about that. I'm not sure the time really is all that positive. Well, so I think that it's the time combined with all of the continued performance that Bok missed. This is not a case where Bok has said, I wasn't underperforming. And that goes more to pretext. You know, the prima facie case, you know, often just comes from the sequence of events that raise an inference that, you know, driven by an improper factor. Right. So I think that even if we assume, I think that our position is we can assume the case of the prima facie case. But when we look at pretext, there's simply nothing there to dispute our legitimacy. But just to be clear on your argument on pretext, it's really twofold. First, it fails on the proximate pause standard because there was a nine month delay. But regardless of the nine month delay, it was still performance related. And that's why, in your opinion, is that correct? That's correct. That, you know, irrespective of whether nine months alone is enough to get you there, we have all of these intervening actions that occur between initially telling her that, look, we need to replace you because we have providers that need to be evaluated. And you yourself are saying you're not sure when you're able to return to work. And, you know, and that unfolding. And then nine months later, where essentially she has continued to perform very poorly. You know, this is not complaints from some of the co-workers that she may be rude or abrasive. These are serious misconduct. She is looking at whether these licenses should be renewed. And she's evaluating them on criteria that are not part of licensure. And then, you know, she disputed certain documents that existed that resulted in one of the provider's clients no longer having a surrogate health care proxy. So, you know, as this all unfolded, it is clear that she is not, in fact, getting better no matter what they do to try to help her improve. But given that, the fact that it was getting worse and worse, it's time to terminate. He just said, I mean, when are you available for a meeting? And she said, I'm available on February 11th. But she didn't know. I guess this is a question. Was there an inference or some basis for her to know that that meeting on February 11th was going to be termination? I don't believe so. I don't think that Bach would have had indication that that was going to be a termination meeting based on the discussion with Lind. I think that when Lind spoke to Bach or sent that email, she wanted to not necessarily pull that out, but say, you know, come in and talk. I don't think that it's generally standard for a speaker to tell an employee, hey, I want to schedule a meeting a week or two later. No, but I just wondered if there was something where she would have anticipated that. It's just the timing is interesting because two days later after setting up the meeting, then she emails with a decision. So it made me wonder whether there's something in the record that would suggest that she had a sense that, you know, this note needed to be obtained so that she could try and get some protection in some way. I don't think so. It was a coincidence. Yeah, I don't think that there's anything in the record. I think that, you know, typically when an employee is significantly underperforming or there's complaints or she's not getting along with providers, it's probably an indication that it may not be working out. But the fact that England, I guess that's the question, England, when England emailed her to set up a meeting, the fact that there was, I mean, was that unusual? Would England have had other meetings just in the normal course? Or she would have said, oh, wait, this is a supervisor, supervisor. I'm, you know, maybe this is getting the attention of my poor performance. Yeah, I do not believe that England typically had meetings with these managers on any regular basis. You know, if there was a problem, she would meet with them to discuss, you know, your reports are not correct or there's missing information or, you know, whatever that would be. But certainly didn't meet regularly just to talk story or to say, you know, how are things going. There may have been. Okay. And then my second question is, England testifies later or states later that that meeting was going to be a termination. Is there something in the record contemporaneous that suggests that the decision had already been made to terminate her on February 3rd? Sure. I think that if you look at the documents that support the concise statement, in fact, it shows that England had reached out to the home office in Tennessee to request the last paycheck be issued and then mailed from Tennessee to Hawaii. So the date of that email combined with the date of what the final paycheck was shows that the termination decision happened prior to that February discussion about reasonable accommodation. Essentially, I just wanted to kind of pull this up by saying, you know, what Bok is asking is for not just all inferences. What she's asking for is all inferences to be drawn in favor of her. But case law does not say all, meaning all, all reasonable inferences. So those that are too speculative or fantastical should not be drawn in favor of Bok. Here, looking at this amount of evidence of non-performance, EPA believes that to draw these types of inferences upon Bok would, in fact, be fantastical or unreasonable. And to adopt that standard would essentially make motion for summary judgment a nullity. An employee who's underperforming could simply make a complaint and then put themselves in an instability. And then an employer could never take action to do anything less than go to trial to try to defend himself. And I think that this court has previously held exactly that. In Mitchell, the court stated, you refuse to make a complaint and prompt to get out of jail a free card based solely on timing of an original complaint. To do what Bok is asking would actually be a martyr from the employment discrimination. So for these reasons, I think it would be an important decision to not discern. Thank you, counsel. Mr. Brower, you have a little over two minutes. Yeah. So following up on a comment from Judge Collins with regard to the May issue, I mean, our position is that what happened in May of 2015 when they told her she didn't come back to work by May 11th, which was contrary to their policies and also FMLA, you know, it shows their intent that they wanted to get rid of her after she had that surgery on her hip. And what happened after that was they set the whole thing up. You know, they did the September 21st plan and they were supposed to follow up with her, but they never followed up with her at all. They never notified her in any way, shape or form that there were any deficiencies. They didn't give her the end of year 2015 review. There are no, um, and I, I reviewed again, except if it's 30, you know, it's not this serious misconduct. I mean, my client came a couple of hours early, did a couple of visits and the people in the home were saying they thought she was coming later and they weren't ready. And I mean, if you read, if you read the 30, uh, the results of the insurance bill, this is not serious stuff. I mean, she shows up early, so what? I mean, maybe it was some misunderstanding about the time. Um, and then also there's no evidence in the record of any communication with the owners and with England in February about the termination. It may go, have an email back. There was no email about, Hey, we're going to, you know, I agree we should terminate, et cetera, et cetera. And also I dispute the fact that, well, what about the request for a final check? That's pretty, that's pretty conclusive, isn't it? Look, I dispute the fact that there's anything in the record about an email requesting a final check. She said that in her declaration, but I double checked the record. Unless I missed something, there is no email to support the fact that she requested a check. And that came up later to justify their termination, which they say, Oh, we made that decision before she ever gave us that, that note from the doctor, which is not true. That's supported by the record. Okay. Counsel, I think we have your argument. Uh, thank you both, uh, for your, your arguments today on this case.
judges: Clifton, Nelson, Collins